will now present the appellant, Karen D'Onofrio, in this case. As the Court is aware, this is a summary judgment case where we've presented 11 issues. Given the relative time constraints, I'm going to actually pretend like this is my reply brief because we didn't file one in this case. So I want to address two particular issues. The first is Judge Hughes' sua sponte granting of the summary judgment against my client on her sexual harassment claims. And the second, and I think the most important issue, is whether the covenant not to compete is enforceable because that essentially undergirds all of the other common law state tort claims in this case. With respect to the sexual harassment claim, there's no dispute that there was a final judgment that was entered by Judge Hughes, which was a take-nothing judgment on all claims that my client had asserted. There's no opinion on the case, so we don't know what Judge Hughes was thinking at the time. But there was no summary judgment motion filed by the defendants on our sexual harassment claim. I think maybe there had been some confusion because the case was filed, per se, by my plaintiff and then later consolidated. As this Court has held routinely, and I also should say that my client didn't get the ten days' notice under Rule 56C that the Court was going to grant summary judgment on her sexual harassment claim. They did file that motion to dismiss not the corporate defendant, but the individual defendants. Was that ever officially granted? What happened with that? You didn't oppose it, I don't think. I think you have to remember that my client filed that case per se, and then it just sort of sat over there, and then when it got consolidated, but no, the Court never formally ruled on the actual 12B. But you agree the individual shouldn't be defendants in the harassment claim? I agree to that. Yeah, I can see that. But the corporate defendant is absolutely proper in this case. And so I just wanted to address an issue that came up in, and I'm going to call it VTG for short, it's vacations ago. They argued that the dismissal was appropriate under Judge Hank's initial conference order, which related to Rule 4M, and it basically had some standard language that said if you don't file the return of service within 120 days, your case could be dismissed. So VTG argued that my client's sexual harassment claims were properly dismissed under that order because she didn't file the return of service. But the important factor to remember is that VTG actually answered the lawsuit within 60 days, so there was no service issue on them. In fact, they conceded that. And then the other fact is that under Rule 4M, you can't dismiss a claim for prejudice, which is what the trial court did in this case. Essentially he just granted summary judgment that didn't exist. So as this court has pointed out on numerous occasions, that's reversible error, so we would ask the court to reverse the summary judgment on sexual harassment and send it back down to the trial court for reconsideration. I want to turn to the covenant not to compete in this case, as the court is well aware. One of the challenges you make is that there was no geographic restriction. Right. I don't see how you, what would a reasonable restriction be for a company like Vacations to Go that's an internet-based business with a global, certainly a national, customer base? I mean, the usual geographic restriction would be, you know, within 50 miles of Houston, but that makes no sense here. That would protect only a small fraction of Vacations to Go's customer base. So for a company with a global customer base, what would be a reasonable geographic restriction, if any? Well, I think there has to be a reasonable geographic restriction under the law, and I think it could be limited to where Karen was working, that she can't solicit clients from the Houston area. How would that protect Vacations to Go? Because maybe 1% of the customers would have been from Houston, and they're all in New York and California going on the internet, and then she'd be able to poach all these customers she met through the company, which is at odds with the entire reason Texas allows these covenants. Well, I think that there may be some misconception with the court is that the model of the competing business was basically that my client and her husband were soliciting people who they knew personally. So this is not an inbound sort of, you know, kind of situation where you're getting thousands of leads from all over the world. And so that's a distinction. I don't know what a reasonable geographical restriction would be for a worldwide company. Yeah, it just seems to me the old views on this in the law don't really account for an internet-based company. And I do think there's some district court decisions that have started to recognize that. But I can say in this particular . . . I think there's one Judge Ellison said a restriction on the Western Hemisphere was reasonable. Half the globe. But he found that was reasonable for this type of business with a global client base. And I don't know that that would be necessarily reasonable in this case, but I think that the other provision of the covenant not to compete, which is also equally important, is that I think it was 6D1, which basically, I mean, prohibits Ms. D'Onofrio from engaging in any business with anybody who had ever been a client of VTG in the prior three years. So let's say she wanted to move to San Francisco to sell insurance. She couldn't do that if she was going to sell to a client of VTG. So I think the Texas Supreme Court has routinely held that anything that acts as an industry-wide prohibition is unreasonable. And I think that's exactly what happens in this situation. Now, I know that Judge Costa, to address your issue, that the appellee did cite a couple of cases with regard to this global issue. And most importantly, I think they relied on an unreported decision in Totino, which basically said that sometimes if there is no geographical restriction, that if it's sufficiently narrowly tailored, that that would be appropriate. And in that case, they limited solicitation to the employee's actual clients, but that doesn't apply here. Basically, they've limited her from doing any business anywhere in the world with any client that had ever worked or bought travel from VTG, whether directly or indirectly. So basically, she's precluded from doing any type of business in the travel industry whatsoever and from doing it anywhere in the world. And so what I would point out also to the Court is that not only is there no geographical restriction, but it's overly broad with respect to the actual scope of the coverage. It was 18 months, right? Yeah, we're not arguing. Isn't it elapsed by now? Yeah, it's done. It's well done and over. But I guess it goes to the claims for that time period. Right. And so I also would point out to the Court that in the Totino case, in the footnotes, they basically distinguish and limit that case. And the Fowler case, which was decided by the Texas Supreme Court, almost had an identical provision to this, which prohibited a party from entering any contract directly or indirectly with any client of the company. And the Texas Supreme Court held that that was unreasonable per se. And so basically, under the standard that this is an issue of law and this Court reviews it de novo, we're asking the Court to find that the covenant not to compete in this case was unreasonable as a matter of law and reverse and render on that. On her FMLA interference claim, because Nolan's going to come back to that, it was an undisputed  rule? I think that she agreed. Yes, I think that that's true. But the reason that she did that was because she had already done the work for commissioned customers so that she didn't want to lose those commissions. Ms. Parsons? May it please the Court, my name is Mary Parsons. I represent the appellant Michael D'Onofrio, who was a third-party defendant in the underlying district court case. If a person unfamiliar with this case would pick up the opposing briefs and read the statement of facts, he probably would think he's got briefs on two different cases. The adage that there are two sides to every story is an understatement in this case. But what that underscores is that the state law claims against Mr. D'Onofrio are so replete with factual issues that summary judgment was inappropriate in this case. It was clear error. The truth is that Vacations to Go's claims against Mr. D'Onofrio are like a house of cards. They are, each of the claims is built upon a set of assumptions or conclusions that are often repeated by counsel but are just not supported by the evidence. On each of these claims, if one of these assumptions falls, the entire claim falls. There are three of these assumptions that, again, are repeated throughout the briefing that are most significant. First is the assumption that Mr. D'Onofrio ever acquired any confidential information that belongs to Vacations to Go. And second, that he actually used that information in the operation of his Cruise One franchise. The evidence that Vacations to Go provided its employee, Mrs. D'Onofrio, with confidential information does not prove that she shared it with her husband. Missing from the record is any evidence that the Cruise One franchise followed any types of computer leads or internet-based leads that Vacations to Go operates on. It was a family, friend-based business. There was certainly some evidence showing that they were trying to keep her involvement quiet because she's on the original papers creating the business, and then don't they try to take her off of it, and there's the backdating issue. I mean, that all seems like they are trying to hide her involvement. Well, there — and that goes to the second assumption, is that somehow Mr. D'Onofrio knew that his wife was committing tortious conduct and that he intended to harm Vacations to Go with that. I think a reasonable jury could conclude that, yes, he was aware of the non-compete and he hired a lawyer to review it because he was trying to prevent his wife from violating any type of duty or contract. He wanted to make sure they were operating within the law, and I think that the evidence before this court shows that Mrs. D'Onofrio — there's certainly a genuine issue of fact as to what role she actually played in the business during the early months. Which one of them sent Cruise One the sales figures? That was a screenshot that Mrs. D'Onofrio — according to Vacations to Go's employment records, Mrs. D'Onofrio took that screenshot. She forwarded it? He didn't? I believe that the email actually came from Mr. D'Onofrio. It was a screenshot that did not show any customer names. It just showed dollar amounts for dollar sales. There were no customers identified on that whatsoever. It was just a screenshot that showed how many dollars she had sold. She clearly had some involvement. The evidence shows she had some involvement because wasn't she going to the training session for Cruise One when she requested two days later her FMLA leave? She was required to attend a training session, and yes, I believe the evidence does show that. But the evidence also shows that she didn't book a single sale, she didn't get certified by any of the cruise lines, and she didn't actually service any bookings at all and work on the business until after she left Vacations to Go's employment. And — When was that? On top of that — Was that disputed? When she left their employment? Well, it is disputed, Your Honor. She believed she'd been terminated. Then the Texas Workforce Commission found that she'd quit the day her FMLA leave started, and then they terminated her in October. So yeah, there are three possible dates of termination. Did Mr. D'Onofrio go with her to this training session? He had a separate training session that he attended. Same location? I believe it is the same location where Cruise One is based. And the purpose of that training, the way all of these travel agencies work is they all have a unique system. Mr. D'Onofrio had been booking travel all his life. He's got years of experience in direct sales anyway, but each one of the systems is confidential and proprietary in and of itself. The Cruise One booking system is vastly different than the Vacations to Go system. And in fact, the Vacations to Go's affidavits even talk about how their system is so special and proprietary. It's different from everybody else's. So whatever training Mrs. D'Onofrio received from Vacations to Go wouldn't carry over to Cruise One anyway. The third significant assumption that is made is that every single one of Mr. D'Onofrio's And that's really incredible. That's an incredible assumption to make. A jury could reasonably believe that the Cruise One customers were just as likely to have booked their travel through Expedia, Travelocity, American Express, or any one of the plethora of booking options out there. And this point makes the District Court's award of damages most troubling. The District Court awarded as damages all of the travel-related commissions that the Cruise One franchise had ever earned. Even the ones that Mr. D'Onofrio sold to himself. The summary judgment record lacks any evidence to support an inference that those bookings would have all gone to VTG but for the Cruise One franchise. The Houston Supreme Court, I mean, the Houston Court of Appeals, first Court of Appeals case in Glatley v. Air Starter Components was very similar, very on point. In that case, the claimant tried to gain the revenue from 100% of the defendant's sales. And the court found that there was no evidentiary basis for the assumption that all of the defendant's sales would have otherwise gone to the plaintiff. That's exactly what we have in this case. There is absolutely no evidence to support the conclusory opinion that VTG would have otherwise earned all of those commissions. If you end up prevailing on some or all of your claims here and we send some of the case back, what's going to happen given the restrictions on traditional discovery that's in the court's scheduling order? I mean, what do you see happening back in the district court if the case ends up there? Well, we're hoping that if the court does remand, that there would be some instruction to the judge with respect to discovery. This is not a Rule 56D issue. This is just a pure abuse of discretion issue. At the very beginning of this case, before my client was even a party, Judge Hughes entered an order quashing all discovery. He basically threw Rule 26 out the window and he said, if you want to send an interrogatory, you have to ask me. Is that a standard in that court? In employment cases, it turns out, yes, that it is. It was back in 2002 when I entered. I don't think that that process complies with the proportionality approach that the rules of procedure are designed to further. So in compliance with that case management order, Mr. D'Onofrio filed a motion for discovery and asked the courts for permission to do a little bit of discovery on the claims that had been asserted against him. And the court terminated that motion with a docket entry. Never allowed any discovery. In response to the summary judgment, though, you didn't file a 56D request saying you needed more discovery. I'm sorry. In response to the summary judgment, you didn't file a 56D request for discovery, did you? We did not, Your Honor. And that was given the history of the case. My client was only in the case for 24 days at the time the summary judgment was filed, and there had already been a couple of hearings where the judge was pushing, you know, there was a lot of document production coming from the D'Onofrio's, nothing coming from the other side. And, again, this really isn't a Rule 56D issue. It's just a pure abuse of discretion for the judge did not allow the defendant to do any discovery in this case. For that reason, we would ask that the court reverse and remand with instructions to the I'd like to briefly turn to, oh, I'm completely out of time. You have a couple of minutes, Your Honor. Sorry. Apologize. Thank you, Your Honor. Good morning, Judges. May it please the Court. George Gibson from Nathan Summers Jacobs on behalf of the Appley Vacations to Go. I'm going to go straight to the primary issues that the appellants addressed to Your Honor. First of all, with regard to the sexual harassment claim, our argument was not merely based upon Judge Hanks' case management, or that is one argument we put in our briefs, but I think the stronger argument, the more pertinent argument is that she filed this pro se sexual harassment claim and then did not provide any evidence that the employer, even if you believe, even if you take for granted on summary judgment that she was harassed, that she never provided any evidence that the employer failed to take prompt action. In fact, if you look at her affidavit, which is a Why did you move for summary judgment on that ground? Because of the procedural history of the way we had already filed for summary judgment, and then she filed this pro se, and then the case was consolidated later, and then the court granted. I thought she alleged that all they did was talk to the IT person, and then she gets reassigned, but then more harassment from a new manager. That's not how I rate it, is that the evidence showed that she was moved away from the people that were harassing her, and then there's no evidence. Her affidavit doesn't say that, well, and the harassment continued, or that it was somehow inadequate what the company did. Obviously, the judge did not give the 10-day notice and kind of the strange procedural way that this case ended up getting on summary judgment. And he didn't even acknowledge the sexual harassment claim. It wasn't addressed. It seemed like it was just forgotten, and then he enters a final judgment. So it was clearly not on the court's mind. It's not addressed in the order. I absolutely agree, Judge. It's not. But, however, I think that on review, it's also incumbent on the appellants to, and there's a number of cases that say that they've got to be able to show your honors here at this level at least, that there was some evidence that they needed to be able to present to raise a fact issue. They did not file a motion for a new trial. They did not file a motion for consideration to let Judge Hughes know that, hey, there's this substantial claim out there that you didn't address that we would have had an opportunity. And then even here at this level, they have not presented any evidence that what the company actually did was somehow, even if you assume the harassment occurred, that's not the only element. They've got to show that we didn't do anything to address it. And, in fact, the evidence shows the opposite, that we did attempt to address it and were never given the opportunity because shortly after that she went on FMLA leave. And that will dovetail into that argument that she, you know, counsel, I believe, conceded that, because it's in the joint chronology where both sides agreed to a certain piece of evidence, that she was offered FMLA and she said either you can continue earning money. We're not required to pay FMLA participants. We said you can continue to preserve your commissions and earn them if you just monitor, and she didn't. And so that ability to monitor those clients was taken away. There was nothing really that was forcing her or requiring her to work. It was an option that was provided to her, and I think that's now been conceded. And the only claim that they have about that somehow she was terminated for FMLA is this e-mail that was sent to her husband, who happened to be a client of VTG, so he got an automatic e-mail, where one of the sales rep didn't word her status exactly right. We put in the record that, you know, that she was not terminated. She was on leave. And the one person who sent an e-mail to Michael D'Onofrio said, you know, something to the effect of she's not with the company anymore. And, you know, that was wrong, and that was incorrect. But we put in the deposition testimony that, you know, she never called us up and said, you know, what's my status. In fact, she had just at the same time gotten from Thane Allen an e-mail that's in the record that specifically said we're going to take away your supervisory rights over these clients. We need to make sure the clients are properly serviced. You haven't been doing that, but you're going to remain on FMLA leave. I mean, that was an affirmative statement to her as to what her status was. And to say that somehow she misunderstood that she was terminated I think just isn't, you know, borne out by the facts that we've put into the record. I think the covenant not to compete is an issue I want to spend a little bit of time on. The case law does say, and one of the cases that we did not cite to you, but I want to bring to your attention, is the Fifth Circuit case 2004, Vase Arms, or Vase. I'm not sure how to write it, F-A-I-S. It's 383 F-3-287, if my eyes aren't failing me. And the Fifth Circuit in that case looked at a very broad restriction on competition and said that because there were marketing efforts, and it was countrywide. It wasn't worldwide in that case, but it was countrywide. And it even said that, you know, to the extent that, number one, there are marketing efforts and sales that are nationwide, and number two, that because the sales efforts were in that scope, just because there wasn't a sale, there were certainly marketing efforts, was enough to impose a broad and wide restriction. It wasn't just 50 miles from Harris County. And it just really depends on— What was the restriction in that case? Was it national? It was national. And in this particular case, there was one that said, and customers that are around the world. And apparently, and I don't know the reasons for this, the employer in that case just backed off of the world, the customers around the world for whatever their reasons. Is there any evidence in this case of where her clients were coming from or even where Vacations to Go's clients generally are from in terms of a breakdown? Yes, Judge. Give me one second. The affidavits that were submitted by the Vacations to Go personnel. Excuse me. In particular, Mr. Hankemer's supplemental affidavit, which was submitted after the filing of the motion but before they filed their response, that talks about that she performed duties that were worldwide in scope and reach, that the email, websites, toll-free numbers, all had to do with global inquiries that did involve Karen D'Onofrio. And this is really critical for this summary judgment appeal, is that all of those facts were undisputed, is that in her disputing affidavit, she did not say, no, I never had contacts worldwide. She did not say, no, I did not have access to the 1-800 number, to the web-based. I mean, so all that and these. But in terms of where her customers actually came from, we don't know. We have that statement in the record. That she was seeking them worldwide. And that she got contacts from the website and also the 1-800 number. I would refer you to Mr. Hancomer's affidavit. That's the primary place where that evidence is. That's undisputed. The issue on enforcement of even broad covenants not to compete, especially when you look at vase and then you look at several of Judge Ellison's decision being one of them, but there's a number of others, including Judge Werlein, that have come up with various. But each one of those, when you look at it, depends on the facts of the case. And that's one of the issues. There is no hard and fast rule. And this court and other federal courts in Texas that are interpreting this court's vase ruling and others don't say that the absence of a geographical restriction is deadly. And it's automatically, no, that's not the case. And, in fact, the Totino case, the reason why we cited it is because it talks about how, well, you can imply it. And in the court's order, which follows, I think word for word, the contract, it does restrict solicitation of customers that had been customers of VTG for the prior three years. And so there is a linkage in the restriction that the judge put in to customers. And various cases, like what Totino, which was cited earlier, said, is that if there's a linkage to customers that serves the basis as a limiting factor for geography, especially, as Your Honor pointed out, in this day and age where, and I think there's probably going to be more law on this, that where marketing is worldwide by the very nature of the Internet, some of these cases are going to have to be revamped or our standards are going to have to be re-evaluated because it doesn't fit what's going on in commerce these days. Is it true that there's only one customer of VTG who then booked travel with the Cruise One franchise? We put on evidence of one customer that, as I understand it, booked travel through VTG and then they said, if you're going to book future travel, make sure that you switch it, you switch your, like for Prince's Cruises, for example, I don't know if that's the one that was in the record, but for one of those cruise lines, make sure you switch your agent to us or else, if you go to Prince's Cruise Lines, it's going to automatically go to VTG. That's how I understand that evidence. There was one that was submitted. Turning for a moment to Michael D'Onofrio's claims, he and his wife were not only partners in matrimony, they were partners in business. The Tranquility Base Enterprises was not even an entity. It was a sole proprietorship, which he and his wife were partners, and so under Texas law, that becomes a general partnership, a joint venture. Those would mean the same thing under Texas law, and both of them own it, both of them had equal rights to control it, and the evidence that we put on was, for example, the application that was submitted, the franchise agreement to Cruise One. They both signed it as partners. The evidence we put on was that it was Michael D'Onofrio that sent the screenshot of Karen D'Onofrio's sales to Cruise One in order to justify, hey, look at what we can sell. What was the confidential information that they took? Well, she obviously took the entire screenshot that included the customer names and the numbers. The screenshot includes the customer names? Not what they sent to Cruise One. Remember, we only got this from our subpoena to Cruise One, and so Cruise One did get the sales numbers, and according to the document, I've seen not the customer names, but she had access to all that. She disputed that she referred to it during her time off, right? She has disputed that she used any customers. To be fair to the evidence that she put on, she disputed that she used any of her customers in soliciting customers for Cruise One. But I don't think that's the test, respectfully. I think that what the test is is that were you using information that was developed, for example, her sales at Vacations to Go, in order to show Cruise One, hey, look at what I can sell. And all the references that are made to the various e-mails, and Your Honors have already referred to that, where they were clearly trying to, they were telling Cruise One, yes, Karen is an owner, but not on paper because we don't want to run afoul of Vacations to Go. I mean, this was being done before she even took FMLA leave and after she took FMLA leave. And one of the things we talked about training, I'm sorry, I can't remember which judge asked about the training, but that Michael D'Onofrio went to Florida in May of 2014 and Karen D'Onofrio went for training in July of 2014. They did not go together. And one of the, I mean, literally days, like two or three days after she said, I need FMLA leave because I have to take care of Michael, she left and went to train for this new business. And then when she got back, she had two weeks from the time she left to submit the proper paperwork for FMLA. And she did that, I think the date was like July 25th, roughly. And she said in there, I've got to be with him, I've got to do all these things for him. Clearly that just wasn't true because she had already left. I would believe the evidence shows that that was all pretext to set up a competing business. They were using her sales at Vacations to Go in order to induce Cruise One to let them do it. She had been extensively trained at Vacations to Go. It seems like you have a strong case to support all this. The problem is you're essentially the plaintiff on all these claims. Yes. To get summary judgment as a plaintiff, especially on some of these claims that have an intent requirement, it's just highly unusual to say as a matter of law you have to find for the plaintiff on all these elements, including that their state of mind was tortuous interference or all these other things. So how do you get around that high standard? I understand that, Judge, and that's a good point. The way I would say it is that it's also true that you can't defeat a summary judgment with a sham affidavit. In other words, if the documents show that you were indeed partners and you were indeed using Vacations to Go information and you were indeed setting up a competing business, which I believe that the e-mails and the franchise agreement show, you can't just avoid that and create a fact issue by signing an affidavit that just says, I didn't ever compete. I think that that's just not enough to raise a fact issue. Because I agree, it's difficult to get summary judgments on some of these. Fraud as an intent requirement. That's one of the claims. Fraud as obviously an intent requirement. And I totally understand, Judge. And that is a difficult burden to get. I think we get it in this case because when you look at the text of the actual evidence and then you look at their affidavits and them just saying, no, we didn't do that, I believe that's a sham affidavit. And that's not enough to raise a fact issue. But the court didn't strike the plaintiffs, or I guess on these claims, the counterclaim defendants' affidavits. I mean, that wasn't the finding of the district court. It did not. You're exactly right. However, when looking at the summary judgment de novo, you look at all the reasons that could be used to support the affidavit, excuse me, the judge's order, whether they're stated or not, and we would rely on that as well. If there's not any other questions, thank you very much. Oh, and we ask that the judgment be affirmed. In rebuttal, I just wanted to address a few issues. I think it's important to sort of take a global view of the case and understand that we are in the summary judgment context. And while, as Judge Costa pointed out, they may have a strong case on some of these claims, there is a fact issue on every single one of them. The affidavit that Karen supplied in this case was not a sham affidavit. She essentially said that she didn't have any confidential information, she didn't have any customer lists, and the last paragraph of her affidavit said she didn't do any work with Cruise One until after her employment ended. And all of the sales that she generated for Cruise One were the result of her own personal contacts and were not obtained from any sales list or other confidential information from BTG, and that she didn't in particular have any specialized training from BTG that she used in those situations, that she has been selling for years and relied on her past experience to get customers. And that creates a genuine issue of material fact on all of their tort claims because she claims she didn't appropriate confidential information from the company. Now, I wanted to just touch briefly on the sexual harassment claim. This was really not our burden to come forward to put on summary judgment evidence after we file our pleading, especially when we have no notice that there is actually the court is going to grant a summary judgment. But as I pointed out in our brief, is that the two particular instances where there was inappropriate touching create a genuine issue of material fact on a hostile work environment. And then as the court has also pointed out, that there was this initial harassment in August, and they moved her, but those accommodations, as stated in my client's affidavit, were insufficient because she was still subject to harassment from the IT, and there was other separate incidents later in January, even after the accommodation, which is ultimately why she sought out legal counsel. So there is definitely an issue of fact on sexual harassment, and we ask that the court reverse and remand that claim. Thank you. And not be in violation of any breach of duty. An employee can form a company while still employed, planning to compete. There's nothing wrong with that. There's nothing illegal about that. Right, but that's not a breach in and of itself. Just owning a company. The fact that she signed the franchise agreement does not constitute a breach of duty. The emails attached to VTG's motion show that her conduct in actually selling, actually booking any customers, getting certifications from the cruise lines, agreeing to manage and train people, didn't happen until January 2015 and later. She wasn't working this Cruise One franchise, although she signed off on the agreement because they made her as part of the level of franchise that they wanted to buy. So the Southern District of Texas in Alliant Group v. Feingold has a great discussion of this concept, and it says there's a tension between the obligations of a fiduciary and his rights as a potential competitor. These are two conflicting public policies. There's nothing against public policy of Mr. and Mrs. D'Onofrio wanting to open a mom-and-pop travel business. Their travel agency is a full-service agency that services families, friends, personal referrals, people from the daughter's dance class. The only overlapping customer, as Judge Higginson pointed out, was a woman who was referred by another mom in her daughter's dance class. Personal referral. She wasn't answering the phones before she left or thought she'd been terminated? There was one period of time that Mr. D'Onofrio was on a trip for his work. He was an engineer for Boeing, and he did tell somebody, I believe it was actually an email about their homeowner's association or something, that said that Mrs. D'Onofrio was covering the phones for him while he was out of town. So I think Judge Costa's opinion in the Cannon v. Jacobs field services was on point in this one, is that if there is some evidence that supports a finding in favor of the non-movement, summary judgment is inappropriate. For that reason, we ask that the court reverse and remand. Thank you. Thank you.